CLAYTON CENTER ASSOCIATES, et al., Plaintiffs/Respondents/Cross–Appellants,

v.

W.R. GRACE & COMPANY, Defendant/Appellant/Cross–Respondent.

Nos. 62184, 62242.

Missouri Court of Appeals, Eastern District, Division Two.

Aug. 3, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 8, 1993.

Application to Transfer Denied Oct. 26, 1993.

the fireproofing contaminated the building, necessitating the product's removal. A jury agreed and awarded plaintiffs both compensatory and punitive damages.

The trial court denied defendant's motion for new trial, but granted its motion for JNOV on the punitive damages award. Defendant appeals the denial of its motion for new trial, raising six points of error. Plaintiffs cross-appeal; their sole point alleges error in granting the JNOV. We affirm.

Defendant's six points allege the trial court erred in: (1) submitting the case to the jury because of insufficient evidence that the product was unreasonably dangerous; (2) denying its motions because the statute of limitations barred plaintiffs' claims; (3) refusing its limiting instruction concerning certain evidence; (4) submitting failure to warn theories to the jury; (5) denying its motions because the economic loss doctrine barred plaintiffs' claims; and (6) admitting evidence of (a) defendant's mine, (b) departure of a tenant from the building, and (c) diminution in value of the building.

### I. Preliminary Motions

■ Before reaching the merits of the appeal and cross-appeal, we must dispose of motions that were ordered taken with the case. First, plaintiffs ask that we strike defendant's 63-page reply brief because, among other things, it exceeded the 25-page limit on reply briefs imposed by Rule 84.04(i).

Defendant responds to the motion by pointing out that this court ordered a specific briefing schedule of four briefs. As a result, defendant's "reply" brief is both a reply brief to plaintiffs-respondents' brief and a respondent's brief to plaintiffs' cross-appeal. Defendant argues that the combined page limits for a reply brief and a respondent's brief should be 25 pages plus 90 pages, for a total of 115 pages. *See* Rule 84.04(i).

Rule 84.04(i) expressly limits a reply brief to 25 pages. Here, the reply portion of defendant's brief consumes almost 47 pages. On the other hand, the response portion of the brief to plaintiffs' one point on appeal is approximately 16 pages.

Thomas C. Walsh, Douglas W. King, St. Louis, for defendant, appellant.

E. Michael Murphy, Doreen D. Dodson, St. Louis, C. Alan Runyan, Robert N. Hill, Hampton, SC, for plaintiffs, respondents.

GRIMM, Judge.

Plaintiffs are the owners of an office building constructed in 1971–73. During its construction, defendant's fireproofing product, which contained asbestos, was installed in the building. At trial, plaintiffs contended that

By filing a 47 page reply brief in violation of the 25–page limitation imposed by Rule 84.04(i), this court would be justified in imposing sanctions. In exercise of our discretion, we decline to do so *this time* and deny the motion. However, future page limitation violations may not receive similar treatment.

■ Second, defendant asks that we strike pages 26 through 35 of plaintiffs' reply brief. Defendant points out that pages 1 to 25 reply to defendant-respondent's brief, while pages 26 through 35 either respond to defendant's reply brief or constitute a second respondent's brief.

Defendant's motion is well taken. The purpose of a reply brief is to respond to matters raised in a respondent's brief. The rules do not permit the filing of a brief to respond to a reply brief, or the filing of a second respondent's brief. If we did not grant defendant's motion, we would be countenancing this completely unauthorized procedure. Pages 26 through 35 of plaintiffs' reply brief are stricken.

## II. Unreasonable Danger

For its first point, defendant alleges the trial court erred "in submitting the case to the jury because the evidence was insufficient to permit the jury to conclude that [defendant's] product was unreasonably dangerous." More specifically, defendant maintains the evidence was not sufficient to "permit the jury to conclude that the particular fireproofing product installed in [the] building [was] unreasonably dangerous to anyone during the normal and expected use of the building."

The case was submitted to the jury using three verdict directing instructions. These instructions submitted the theories of (1) negligent design or failure to warn, (2) strict liability for a product defect, and (3) strict liability for failure to warn. "Unreasonably dangerous" is an element in each of the strict liability submissions.

The "concept of unreasonable danger ... is presented to the jury as an ultimate issue without further definition." *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 378 (Mo. banc 1986). The jury "gives this concept content by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties." *Id.*

■ In reviewing the submissibility of plaintiffs' case, we view the evidence in the light most favorable to the verdict. As a result, plaintiffs are entitled to the benefit of all favorable inferences that may be reasonably drawn from the evidence. Further, we must disregard defendant's evidence except as it aids plaintiffs' case. *School Dist. of Independence v. United States Gypsum Co.,* 750 S.W.2d 442, 455 (Mo.App.W.D.1988) [hereinafter *Independence* ].

■ *Independence* involved a strict products liability claim arising out of the use of ceiling plaster containing asbestos. There, as here, the defendant contended that plaintiffs failed to present evidence that the plaster was unreasonably dangerous. The western district concluded there was sufficient evidence to show [1] that the product in question contained asbestos, "which could, if released, cause a definite health hazard, [2] that [the product] did release asbestos into the School District's buildings, and [3] that it was, therefore, unreasonably dangerous." *Id.* at 455 (bracketed material added).

Here, defendant's fireproofing product was Mono–Kote. Defendant does not dispute that Mono–Kote contained asbestos. Evidence showed the Mono–Kote applied in the building was friable, or easily crumbled. In some areas, the Mono–Kote had deteriorated to the extent that it had fallen from the beams; dust and debris, which was full of asbestos fibers, was present on the tops of ceiling tiles. Testimony showed these released fibers threatened a risk of harm to occupants of the building, particularly maintenance workers. Further testimony indicated dust samples taken from different areas in the building contained high concentrations of asbestos structures.

It is not necessary to chronicle all of plaintiffs' evidence that would support submission of the case to the jury. Based on the above, a jury could reasonably conclude that Mono–Kote was unreasonably dangerous. Point denied.

### III. Statute of Limitations

For its second point, defendant alleges the trial court erred "in refusing to grant [its] motions for directed verdict and judgment notwithstanding the verdict because [plaintiffs'] claims were barred by the statute of limitations."

■ We first note that the statute of limitations is an affirmative defense. Rule 55.08. As such, the burden of proof is on defendant as its proponent. After the trial court denied defendant's motions based on the statute of limitations, the court submitted the issue to the jury.

An action for negligence or strict liability must be brought within five years after the cause of action accrues. § 516.120(4).[1] A cause of action accrues "when the damage ... is sustained and is capable of ascertainment." § 516.100.

■ In Missouri, a cause of action in tort for asbestos contamination accrues upon "release of toxic asbestos fibers into the environment ... together with the ability to ascertain a substantial and unreasonable risk of harm from the release of the toxic asbestos fibers." *Kansas City v. W.R. Grace & Co.*, 778 S.W.2d 264, 268 (Mo.App.W.D.1989) (citing *Independence*, 750 S.W.2d at 457).[2] Thus, plaintiffs could not sue until both events occurred. *Kansas City*, 778 S.W.2d at 268.

■ In support of its argument, defendant points to public information about asbestos, as well as two specific occurrences indicating the damage was capable of ascertainment. The first occurrence was an August 25, 1980 real estate appraisal of the building. Under the heading "Fire Protection," the appraisal says:

> Garage columns and beams are sprayed with an asbestos coating. Parts are removed as a result of cars scraping the material and water seepage from the Plaza.

The second involved a series of letters in 1983. In March, 1983, an attorney officing in the building wrote to the company managing the building. The attorney inquired whether the girders and ceiling in the parking garage contained asbestos. No response was received, so he sent a second letter on June 22, making a similar inquiry.

Plaintiffs argue, however, that knowledge of the mere presence of asbestos is not actionable. It points out that two factors are required, namely release of toxic asbestos fibers into the environment and a plaintiffs' ability to ascertain a substantial and unreasonable risk of harm from the release of the toxic asbestos fibers. *Kansas City*, 778 S.W.2d at 268.

Plaintiffs emphasize an August 16, 1983, letter defendant wrote to plaintiffs' architect. In that letter, defendant said "the asbestos fibers [in Mono-Kote] are encapsulated in the matrix; and, therefore, are not subject to release into the environment." It further said "only on-site air sampling measurements will determine the actual airborne asbestos fiber concentrations."

The record is unclear as to what motivated the company managing plaintiffs' building to have a laboratory conduct sampling and analysis for airborne asbestos. Regardless, tests were conducted August 15, the day before defendant's letter to plaintiffs' architect. Laboratory sent a report on August 17. The results of the sampling showed fibers/cc of 0.0002 to 0.0006. Permissible exposure was indicated to be 2.0 fibers/cc.

We mention these events between 1980 and 1983 because the crucial date is August 10, 1983, five years before plaintiffs' petition was filed. The laboratory results, received sometime after August 17, 1983, did not indicate asbestos contamination at that time. Defendant did not establish that plaintiffs' claim was barred as a matter of law by the statute of limitations. Point denied.

---

1. All statutory references are to RSMo 1986.

2. We note that in both *Kansas City* and *Independence,* application for transfer to our supreme court was made. In both instances, this application was denied.

## IV. NESHAPS

For its third point, defendant contends that the trial court erred "in admitting plaintiffs' evidence on NESHAPS [National Emissions Standards for Hazardous Air Pollutants] while refusing to give defendant's limiting instruction on the use of such evidence, because actions that may ultimately be required by NESHAPS cannot be used to establish [defendant's] liability."

■ We first note that defendant is correct in its assertion that NESHAPS does not give rise to a cause of action for asbestos contamination. *See Kansas City*, 778 S.W.2d at 269. NESHAPS is, however, admissible to show damages. In *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 374 (Mo. banc 1993), our supreme court held that "NESHAP rules are relevant to the issue of damages...."

Early in the trial, NESHAPS was mentioned in an exhibit. Defendant did not object to the exhibit. Following the reading of the portion referring to NESHAPS, defendant's counsel asked the trial court to give a limiting instruction. Plaintiffs' counsel said he had not seen the tendered instruction.

The trial judge said that plaintiffs' counsel should "have an opportunity to review it. And we need to discuss it further. At this time I will decline to give it.... But I will entertain this subsequently, so this ruling with respect to this matter is without prejudice." Although NESHAPS is mentioned numerous times in the testimony, the record does not disclose any further request for a limiting instruction until the instruction conference.

At the conference, defendant tendered this instruction:

> There have been references to the National Emissions Standards for Hazardous Air Pollutants regulations, sometimes called NESHAPS. These regulations were enacted by the EPA after the sale of the fireproofing product in this case. You may not consider evidence concerning NESHAPS on the issue of whether defendant is liable to the plaintiff[s]. NESHAPS only mandates the manner in which the material is to be removed, if and when it is removed. It has no bearing on the

issue of whether [defendant] was negligent or whether its fireproofing product was defective.

The trial court refused the instruction.

■ When a trial court receives evidence admissible for one purpose but not for another, a party upon request is entitled to an instruction limiting the extent and purpose for which the jury may consider the evidence. *Dyer v. Globe–Democrat Publishing Co.*, 378 S.W.2d 570, 581 (Mo.Div. 2 1964); *Thigpen v. Dodd's Truck Lines, Inc.*, 498 S.W.2d 816, 818 (Mo.App.E.D.1973); *Lane v. Amsted Indus., Inc.*, 779 S.W.2d 754, 759 (Mo.App.W.D. 1989). Here, the NESHAPS evidence was admissible on the issue of damages, but not on the issue of liability. When requested, an appropriate limiting instruction should have been given.

■ However, defendant is not entitled to a reversal merely because the court refused its instruction. Although the failure to give an instruction that a party is entitled to is error, reversal is warranted only when the merits of the action are materially affected. *See Allison v. Sverdrup & Parcel and Assoc., Inc.*, 738 S.W.2d 440, 454 (Mo.App.E.D.1987).

■ Defendant points to two instances where plaintiffs allegedly used NESHAPS to prove liability. Our review of these instances does not leave us with the impression that the merits of the action were materially affected by the trial court's failure to give defendant's limiting instruction. The arguments defendant points to arguably show damages. As noted above, our supreme court approved admission of NESHAPS for this purpose. Point denied.

## V. Failure to Warn

■ For its fourth point, defendant alleges the trial court erred "in submitting plaintiffs' failure-to-warn theories to the jury because plaintiffs failed to establish that they did not receive a warning or that any such warning would have made any difference." The instructions submitting negligence and strict-liability included failure to warn as an element.

Defendant acknowledges it never placed a warning about asbestos on bags of Mono–Kote. However, it points to information it furnished to specific individuals and groups about asbestos in Mono–Kote. Despite defendant's assertions, nothing in the record indicates this information was given to plaintiffs.

Defendant also points out that during the relevant time, it furnished brochures describing Mono–Kote to *Sweet's Architectural Catalog File*. *Sweet's* is a resource catalogue for individuals and companies involved in the construction business, including architects. Because language from *Sweet's* was similar to language used in the building's specifications, defendant argues that plaintiffs' architect "saw the 1971 Sweet's Catalog and the information about asbestos it contained."

In the 1971 *Sweet's,* published in October, 1970, the brochure said:

Existing formulations of Mono–Kote contain minimal amounts of asbestos which are "locked in" during the mixing process. Mono–Kote is wet-mixed, pumped and sprayed and hardens to a cementitious mass. Job-site tests show air fiber counts well below occupational threshold limit values proposed by governmental bodies.

At trial, however, defendant's fireproofing product manager acknowledged that the quoted material was not intended to warn that asbestos was hazardous. Rather, defendant was "trying to tell [people] that the asbestos in [defendant's] product isn't a problem at all."

Defendant's St. Louis architectural representative said that the architect for the project was one of the people he called on. He would tell architects the hourly fire rating available by using Mono–Kote and the "thickness you used, and so forth." He never discussed health issues of Mono–Kote with any architect.

Evidence shows that over a period of years, defendant decided not to publicly disclose that Mono–Kote contained asbestos. One example was a report of a November, 1969 committee meeting in which some of defendant's management employees participated. At that meeting, the decision was made "not to write to Underwriters' Laboratories about the asbestos hazard" of Mono–Kote.

Other evidence was presented that defendant knew of the asbestos hazard of Mono–Kote. To avoid unduly lengthening this opinion, suffice it to say that plaintiffs presented sufficient evidence from which a jury could reasonably find that plaintiffs did not receive a warning. Further, the jury could find that plaintiffs would not have installed Mono–Kote if a proper warning had been given concerning the health hazard. *See Keene Corp.,* at 370–71. Point denied.

## VI. Economic Loss Doctrine

For its fifth point, defendant contends that the trial court erred "in refusing to grant [its] motions for directed verdict and judgment notwithstanding the verdict because the strict liability and negligence claims were barred by the economic loss doctrine." When applicable, the economic loss doctrine denies recovery for any loss that is purely economic.

In support of this contention, defendant relies primarily on *Sharp Bros. Contracting Co. v. American Hoist & Derrick Co.,* 703 S.W.2d 901 (Mo. banc 1986). In *Sharp Bros.,* our supreme court denied recovery "on a theory of strict liability in tort, as a matter of policy, where the only damage is to the product sold." *Id.* at 903. It also applies in negligence actions. *See Sharp Bros. Contracting Co. v. American Hoist & Derrick Co.,* 714 S.W.2d 919, 922 (Mo.App.W.D.1986). In the companion *Sharp Bros.* cases, the defendant sold a crane. The counterweight of the crane broke, crushing the crane's cab. There was no personal injury or other damage. *Sharp Bros.,* 703 S.W.2d at 902.

Unlike the plaintiff in *Sharp Bros.,* here plaintiffs claimed damage to property other than the product sold. They claimed the Mono–Kote released asbestos, contaminating the building and its contents. As discussed earlier, the evidence supports this claim. The economic loss doctrine is not applicable here.

Our conclusion is supported by *Independence,* 750 S.W.2d at 455–57. There, our

western district colleagues considered a similar argument. In rejecting it, the court noted that the issue of damages arises from replacement of a product and other items of personal property caused by contamination. *Id.* at 457. Point denied.

## VII. Admission of Evidence

For its final point, defendant alleges the trial court erred "in admitting evidence concerning the Libby, Montana Mine, the departure of the GSA from the [building], and the alleged diminution in value of the building because the evidence was irrelevant, immaterial and highly prejudicial."

### A. The Libby Mine Evidence

■ In its brief, defendant admits it mined and processed vermiculite ore used in Mono–Kote and other products. Vermiculite, the primary ingredient of Mono–Kote, is not a form of asbestos. However, some tremolite asbestos was present in the vermiculite and tremolite asbestos was found in plaintiffs' building.

Plaintiffs offered this evidence to show defendant had notice of the dangers associated with asbestos. Defendant contends that the circumstances at the mine and the circumstances at the building were not substantially similar. Thus, it argues this evidence was not relevant.

"A trial court has substantial discretion in the admission of evidence, and will not be overturned absent an abuse of discretion." *Harashe v. Flintkote Co.,* 848 S.W.2d 506, 510–11 (Mo.App.E.D.1993). In *Harashe,* plaintiff claimed damages from his exposure to asbestos and subsequent mesothelioma. This court held that the Libby documents were "relevant as to notice." *Id.* at 511. We see no abuse of discretion.

### B. Departure of GSA & Diminution of Value

Defendant objects to plaintiffs' production of evidence that GSA, a federal agency tenant, left the building because of the asbestos. It also objects to plaintiffs' building manager's valuation of the building.

At trial, defendant's objection to the testimony about GSA was hearsay; the objection to the building manager's testimony was hearsay and that no foundation was laid that the manager had "any knowledge about what the value is with or without asbestos."

On appeal, defendant's point alleges "the evidence was irrelevant, immaterial and highly prejudicial." We will not convict the trial court of the asserted error when that objection was not made at trial. Point denied.

## VIII. Cross–Appeal

For its sole point on cross-appeal, plaintiffs' allege "[the] punitive damage verdict should be reinstated."[3]

■ The trial court sustained defendant's motion for JNOV on the punitive damages award. We, therefore, must decide whether "there was sufficient evidence to establish that defendant's conduct in selling its product was outrageous because of an evil motive or reckless indifference to the rights of others." *Keene Corp.,* at 374. Punitive damages are appropriate only where "the defendant knew of the defect and danger of the product and, by selling the product, showed complete indifference to or conscious disregard for the safety of others." *Id.*

■ Plaintiffs' claim the following evidence supports submission of punitive damages:

A 1964 newspaper article, which said that medical specialists were pointing "a finger of suspicion" at asbestos as a cause of cancer. Plaintiffs emphasize the portion of the article stating that "[o]rdinary wear-and-tear" *might* release dust into the atmosphere.

Results of tests that were conducted on Mono–Kote by an independent laboratory in December, 1966, showing erosion or dusting of Mono–Kote of 0.0197 grams per square foot. GSA specifications required a maximum of 0.01 grams per square foot.

Defendant's 1970 Long Range Plan, dated October, 1969, which says that "[a]sbestos fiber is a health hazard during the application of Mono–Kote."

**3.** Although this point does not comply with Rule 84.04(d), we review it nevertheless.

A draft of defendant's consumer products division's 1970 Long Range Plan which states that defendant has "an asbestosis problem with Mono–Kote, a fireproofing material which incorporates asbestos.... Asbestos is rapidly becoming recognized as a very serious health hazard."

A June, 1970 memorandum concerning one of defendant's manager's meeting with New York State's Chief of Environmental Medicine and New York City's Environmental Commissioner. At the meeting, the environmentalists said they wanted to put an end to pollution, including asbestos "which can in any way endanger the health of workers, office employees, and the general public." Their concern included "future demolition of buildings that will release asbestos or other materials into the atmosphere."

An August, 1970 memorandum, in which one of defendant's employees was given the responsibility to coordinate data about Mono–Kote's safety. Air samples were to be taken in buildings insulated with Mono–Kote and at building sites where demolitions were being done. These samples would then be tested with an electron microscope. The record does not disclose whether these samples were obtained or the tests were conducted.

Testing defendant had conducted in 1970, which indicated an increased presence of asbestos fibers after air was blown over Mono–Kote.

The evidence does not show that defendant had actual knowledge that the product was dangerous after it was installed in a building. There is no evidence that defendant had an evil plan to injure plaintiffs or its tenants or acted in reckless indifference to the rights of others. *Cf. Keene Corp.*, at 375. Point denied.

The trial court's judgment is affirmed.

CRANDALL, P.J., and PUDLOWSKI, J., concur.