Hal ELTISTE, Frances Eltiste, Rebecca Bremer and Leah Eltiste, by and through her next friend, Frances Eltiste, Appellant,

v.

FORD MOTOR COMPANY, Respondent.

No. ED 84814.

Missouri Court of Appeals, Eastern District, Division Three.

June 28, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 28, 2005.

Thomas J. Murray, Murray & Murray, Sandusky, OH, Eric W. Kruger, Rickerson, Kruger & Ratz, Omaha, NE, Daniel T. Ryan, Bollwerk & Ryan, St. Louis, MO, Terry W. Mackey, Hickey & Mackey, Cheyenne, WY, for appellant.

Robert T. Adams, Shook, Hardy & Bacon, Kansas City, MO, John Randolph, Baker, Donelson, Bearman, Caldwell & Berkowitz, Nashville, TN, for respondent.

CLIFFORD H. AHRENS, Presiding Judge.

Hal Eltiste ("Mr. Eltiste"), Frances Eltiste ("Mrs. Eltiste"), Rebecca Bremer, and Leah Eltiste[1] ("plaintiffs") appeal from the judgment of the trial court following jury verdicts in favor of defendant Ford Motor Company ("Ford") on plaintiffs' personal injury action.[2] Plaintiffs contend that the trial court erred in admitting a report of the Office of Defect Investigation ("ODI") of the National Highway Traffic Safety Administration ("NHTSA") and in preventing plaintiffs from impeaching that report ("2000 ODI report").[3] Plaintiffs also assert that the trial court erred in limiting the discussion of their experts concerning documents from Ford to a verbatim reading of the documents. Plaintiffs further allege that the trial court erred in permitting Ford to amend its answer to assert the affirmative defense of lack of seat belt usage and in permitting Ford to introduce seat belt evidence relating to the issue of causation.

Viewed in the light most favorable to the judgment, the evidence is as follows. On May 22, 1994, a clear, sunny day, plaintiffs were riding in a 1991 Ford Aerostar van on Nebraska Highway 67, traveling approximately 60 miles per hour with the cruise control engaged. The driver of the Aerostar, Mr. Eltiste, tried to slow the vehicle down as it approached an intersection of another highway. Instead, the vehicle accelerated and went over an embankment, injuring several of the plaintiffs.

---

1. Leah Eltiste, a minor, appeals by and through her next friend, Frances Eltiste. As of the date of the trial, Rebecca Bremer, the daughter of Mrs. Eltiste and step-daughter of Mr. Eltiste, was married and known as Rebecca Moore.

2. Heritage Ford, Inc., a Nebraska corporation engaged in selling vehicles, initially was also

a defendant in this case, but the petition was dismissed as to it. *See State ex rel. Auburn Ford, Inc. v. Westbrooke,* 18 S.W.3d 143 (Mo. App.2000).

3. Plaintiffs refer to the 2000 ODI report as the "McMath Denial," which refers to the genesis of the report in litigation in Texas similar to the case before this Court.

Prior to the accident of May 22, 1994, Mrs. Eltiste had experienced unexpected acceleration while driving the Aerostar with the cruise control engaged, which had resulted in the vehicle striking a tree. The Aerostar was inspected at a Ford dealership in Nebraska, Heritage Ford, Inc., but apparently no work was done on the cruise control. After the body of the car was repaired at a body shop, the vehicle was returned to the Eltistes several weeks prior to the May 22nd accident.

Plaintiffs filed suit against Ford, and asserted multiple causes of action including: strict liability—product defect; strict liability—failure to warn; breach of implied warranty; negligent manufacture, design, or failure to warn; negligence; failure to recall or retrofit defective design and/or manufacture; fraudulent concealment; and loss of consortium. Approximately two weeks prior to trial, Ford moved to amend its answer to include specifically the affirmative defense that the plaintiffs failed to mitigate damages by not using their seat belts. In its motion seeking leave to amend, Ford stated that it did not believe that the amendment was necessary, but "[o]ut of an abundance of caution," wanted to make the amendation. The trial court granted this motion and denied plaintiffs' motions in limine regarding the seat belt issue. Ford also filed an omnibus motion in limine, which included a request that the trial court preclude testimony by plaintiffs' experts that would interpret Ford documents as evidence of Ford's knowledge, intent, or state of mind. At *in camera* proceedings the trial court sustained Ford's omnibus motion in limine.

Several of the plaintiffs testified at trial regarding the accident of May 22, 1994. Mr. Eltiste testified that he had the cruise control engaged at the time of the accident and tried to disengage it by tapping on the brakes, but to no avail. He further stated that when he pumped the brakes, the Aerostar accelerated even faster, and his other efforts to slow down were to no avail. Mrs. Eltiste testified about the May 22nd accident and about the previous incident of sudden acceleration. Several witnesses testified about similar incidents that they experienced with sudden acceleration and cruise control in Ford vehicles.

Plaintiffs also had several experts testify, including Samuel Sero ("Sero") and Dr. Anthony Anderson ("Dr. Anderson"). Sero, a self-described "forensic engineer" has a B.S. in Electrical Engineering, is a member of the Society of Automotive Engineers, and worked for some years in various capacities as an electrical engineer before becoming a private consultant in 1979. Sero began consulting as a forensic engineer in 1989, investigating the causes of accidents. Sero testified regarding what he considered to be problems with the cruise control system of certain Ford vehicles, including 1991 Aerostars, and how electro-magnetic interference ("EMI") could cause sudden acceleration in cars with such cruise control systems without leaving physical evidence of such an occurrence. He also stated that his review of Ford engineering documents supported this theory. Dr. Anderson, who holds a doctorate in electrical engineering, testified concerning the design of the cruise control system used in the 1991 model Aerostar and the possibility of sudden acceleration resulting from EMI.

Ford presented testimony from several experts, including Victor DeClercq ("DeClercq") and Dr. Catherine Corrigan ("Dr. Corrigan"), in its defense. DeClercq has a degree in physics and worked for many years for Ford primarily in electronics before becoming a consultant. DeClercq has testified as an expert for Ford in other litigation involving claims of sudden acceleration. DeClercq discussed the testing that Ford performed when he was supervi-

sor of Ford's Electromagnetic Compatibility facility from 1984 to 1994, and what Ford did not test. He stated that the only way that a sudden undesired acceleration could happen would require simultaneous shorts in the solenoids in the cruise control servomechanism that would leave physical traces. DeClercq testified that no such physical evidence was found in examinations of the Eltistes' 1991 Aerostar. He discussed the 1989 NHTSA report on sudden acceleration, which was based on information supplied by Ford to NHTSA, and the 2000 ODI report, which criticized Sero's theory of electromagnetic interference with cruise control mechanisms as a cause of unwanted sudden acceleration. Dr. Corrigan, a biomechanical engineer, testified that based on the reconstruction of the May 22, 1994 accident and the injuries of the plaintiffs, that Mr. Eltiste and Mrs. Eltiste were not wearing seat belts at the time of the accident.

A large number of documents were introduced into evidence. These documents included the 1989 NHTSA report, the 2000 ODI report, studies on sudden acceleration from Canada and Japan, and numerous documents from Ford's records.

The jury returned verdicts in favor of Ford and awarded no damages to plaintiffs, and the trial court entered its judgment on April 12, 2004. Plaintiffs now appeal from that judgment.

In their first point on appeal, plaintiffs contend that the trial court erred in admitting the 2000 ODI report without first determining whether the document was reliable, thereby violating the requirements of Missouri law and the Missouri Constitution on the admission of "public records."

■ Ford asserts that plaintiffs failed to properly preserve this claim of error, though it does not indicate in what manner plaintiffs failed to preserve this error. Counsel for plaintiffs objected to the introduction of the 2000 ODI report in a sidebar conference in which he stated:

The McMath denial arises from litigation involving the Chapman family. The lawyer representing the plaintiffs in that case, he filed a request to the agency [NHTSA] that they reopen the investigation which I have not objected to, but I suggest for numerous reasons, hearsay, and many other reasons, this response to a petition from the lawyer involved in litigation renders this particular denial of his petition a very different kind of fish from the 1989 part which as I understand for the jury would be admissible.

So for those reasons, reliability based on hearsay, and the fact that it was done in the context of litigation, I respectfully submit they should not be allowed to read any of the contents of that particular—

In their motion for a new trial, plaintiffs asserted as grounds for their motion that the trial court committed prejudicial error in admitting the 2000 ODI report, "as it does not meet the threshold of trustworthiness to support admissibility."

Although the initial objection could have been phrased better, plaintiffs' counsel did raise a sufficient objection so as to preserve the claim of error, and the motion for a new trial included that ground, this time more clearly, albeit briefly, articulated. Plaintiffs properly preserved their first point on appeal.

■ Section 490.220 RSMo (2000) provides that

All records and exemplifications of office books, kept in any public office of the United States, or of a sister state, not appertaining to a court, shall be evidence in this state, if attested by the keeper of said record or books, and the seal of his office, if there be a seal.

The Missouri Supreme Court addressed this statute and the admissibility of rec-

ords from NHTSA in *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47 (Mo. banc 1999), a case cited by Ford in its response to plaintiffs' objection to the introduction of the 2000 ODI report. The Missouri Supreme Court observed that section 490.220 eliminated the foundational requirements of authentication, best evidence, and hearsay for the admission of certain public documents. *Id.* at 55. It noted that in prior cases regarding this statute, it had concluded that "[s]o long as the requirements of the statutes are met and the records are relevant, they are admissible." *Id.* (quoting *Hadlock v. Director of Revenue*, 860 S.W.2d 335, 337 (Mo. banc 1993)). In finding that the NHTSA reports at issue in that case were admissible even though the reports encompassed opinions and conclusions, the Missouri Supreme Court observed that they met the foundational requirements of section 490.220, and once that threshold had been met the reports were admissible "in their entirety" because the statute "is unqualified and open-ended." *Id.* at 56.

The language of section 490.220 is unambiguous, unqualified, and open-ended. The Missouri Supreme Court did not add any additional requirements to the statute, save to note that a public record offered into evidence had to be relevant. Relevance is a requirement for admitting any evidence, and is in fact the principal criterion for the admission of evidence. *See Porter v. Toys 'R' Us–Delaware, Inc.*, 152 S.W.3d 310, 318 (Mo.App.2004). Plaintiffs argue that the Missouri Supreme Court intended to incorporate a requirement similar to that in federal court that the public record sought to be admitted has to be "trustworthy," noting the citation to *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 161–70, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) by the Missouri Supreme Court. *Suzuki*, 996 S.W.2d at 57. Plaintiffs assert that "*Beech Aircraft* was cited by the Supreme Court in Missouri with approval as the predicate for its conclusion in *Suzuki* that there should be no distinction between fact and opinion in assessing the admissibility of a public document."

What the Missouri Supreme Court actually stated was that:

> Finally, this Court disagrees with plaintiff's policy suggestion that the admission of such "unbridled rank hearsay" is a grave mistake. In the first place, this Court has no choice in the matter because, as stated, admission of the reports is required by statute. In addition, under Rule 803(8)(c) of the Federal Rules of Evidence, United States government reports, conclusions and all, are routinely admitted for plaintiffs and defendants alike.

*Id.* It cited to five cases, including *Beech Aircraft*, and an article. It also stated that "As the Supreme Court has observed, there should be little concern over conclusions contained in such reports because they are 'subject to the ultimate safeguard—the opponent's right to present evidence to contradict or diminish the weight of those conclusions.'" *Id.* (quoting *Beech Aircraft*, 488 U.S. at 168, 109 S.Ct. 439).

We note that the Missouri Supreme Court said that the admission of the NHTSA reports was required by section 490.220, and that *in addition* to that requirement, such reports are routinely admitted under the Federal Rules of Evidence, citing *Beech Aircraft*. *Beech Aircraft* was not a predicate to admitting the reports in *Suzuki*, but rather additional support contravening the plaintiff's policy argument in that case. Plaintiffs acknowledge that *Suzuki* "seemingly dispenses" with all criteria other than authentication and relevancy, but argue that such a reading constitutes a significant departure from Missouri law and the law of all other jurisdictions. Plaintiffs quote from a

commentary that claims that such a reading of *Suzuki* would remove discretion to exclude unreliable hearsay and untrustworthy opinion testimony, would give preferential treatment to foreign records, and would create a much broader hearsay exception than contained in the Federal Rules of Evidence or the rules of other jurisdictions.[4] We note that in his dissent in *Suzuki*, Judge White raised similar concerns about a *per se* rule of admissibility regardless of trustworthiness. *Suzuki*, 996 S.W.2d at 72. In light of Judge White's dissent, it seems apparent that the *Suzuki* majority was aware of the potential impact of adopting a bright-line rule of admissibility of federal records, subject only to the foundational requirement of section 490.220 and the requirement of relevancy. We are constrained to follow the decision of our Supreme Court in *Suzuki*. Under section 490.220 and *Suzuki*, the trial court did not err in admitting the 2000 ODI report even without any evidence of its reliability or trustworthiness. Point denied.

Because plaintiffs' second and third points relied on involve related issues, we will address them together. In their second point on appeal plaintiffs argue that the trial court erred by preventing them from impeaching the trustworthiness of the 2000 ODI report in violation of due process and section 490.220. In their third point on appeal, plaintiffs assert that the trial court erred by abusing its discretion in precluding their experts, Sero and Dr. Anderson, from interpreting or referring to Ford's engineering documents "in any other manner than reading verbatim from the text."

■ Ford contends that plaintiffs' claim of error in its second point relied on is not preserved, apparently because plaintiffs failed to make an offer of proof, and explicitly asserts that plaintiffs' third point relied on is not preserved because of the failure to make an offer of proof.[5]

■ In general, appellate courts will not review excluded evidence without a definite and specific offer of proof. *Frank v. Environmental Sanitation Management*, 687 S.W.2d 876, 883 (Mo. banc 1985). There is a narrow exception to this general rule. *Id.* To come within this exception requires meeting the elements of the three prong test set forth in *Frank*, which are: "First, it requires a complete understanding, based on the record, of the excluded testimony. Second, the objection must be to a category of evidence rather than to specific testimony. Third, the record must reveal the evidence would have helped its proponent." *Id.* at 883–84. These three requirements have been met. Plaintiffs' expert Sero had been deposed prior to trial and plaintiffs' response to Ford's omnibus motion indicated what Sero and Anderson would have testified to, at least generally, such that the first prong was met. The excluded evidence all related to interpretation of Ford documents, which falls into a category of evidence, meeting the second prong. It is also fairly apparent that it would have helped the plaintiffs if their experts could have interpreted Ford documents to show that Ford was

---

**4.** Plaintiffs quote from and cite to the following article: Charles and Andrew Buchanan, *Public Record Hearsay—A Dramatic Expansion?*, 58 J. Mo. Bar 96 (2002).

**5.** Ford did not indicate in its brief just how plaintiffs failed to preserve this claim of error, but in its response to plaintiffs' third point relied on, Ford asserted that plaintiffs failed to make an offer of proof regarding the interpretation of Ford documents by Sero and Dr. Anderson. The argument section of plaintiffs' second point relied on asserts that the trial court prevented Sero and Dr. Anderson from interpreting Ford documents to rebut the 2000 ODI report.

aware of the issue of EMI and sudden acceleration relating to cruise control and in essence acknowledged its existence. Plaintiffs' failure to make an offer of proof did not result in a failure to preserve the claim of error.

■ In addition, Ford argues that plaintiffs' second and third points relied on fail to comply with Rule 84.04. Plaintiffs' second point on appeal does not, in fact, comply fully with the requirements of Rule 84.04(d). It does not indicate how the trial court prevented them from impeaching the 2000 ODI report. It is the argument portion of the brief that contends that the trial court's error was in preventing plaintiffs' experts from interpreting Ford documents. We need not consider arguments not raised in the point relied on. Rule 84.04(e); *City of Sullivan v. Truckstop Restaurants, Inc.*, 142 S.W.3d 181, 193 (Mo.App.2004). Plaintiffs' third point relied on fails to comply with Rule 84.04(d). It does not concisely state the legal reasons for their claim of reversible error and explain, briefly, why those legal reasons support their claim of error. It also is devoid of any legal authority to support its position, save for a reference to Mo. Evid. Prin. 703 [6], which is of little utility. The argument portion of plaintiffs' brief on this point is similarly devoid of authority. Nevertheless we will review these points *ex gratia.*

■ Section 490.220 does not include a provision mandating the admission of evidence that purportedly rebuts a public record. As such it cannot be the basis for this claim of error. Rather, the standard of review for a trial court's decision to admit or exclude evidence is whether the trial court abused its discretion. *Porter,* 152 S.W.3d at 317. The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and so arbitrary and unreasonable that the ruling shocks the sense of justice and indicates a lack of careful deliberation. *Id.* (quoting *Nelson v. Waxman,* 9 S.W.3d 601, 604 (Mo. banc 2000)). In particular, the admission of expert testimony is governed by section 490.065.[7] *State Board of Registration for the Healing Arts v. McDonagh,* 123 S.W.3d 146, 153 (Mo. banc 2003). A witness may be qualified as an expert by skill, knowledge, training, education, or experience. *Whitnell v. State,* 129 S.W.3d 409, 413 (Mo.App.2004). Expert testimony ought to be admitted if the witness has some qualification. *Id.* "[T]he admission or exclusion of expert opinion testimony is a matter within the discretion

---

6. Plaintiffs apparently are referring to William A. Schroeder, 22 A *Missouri Practice: Missouri Evidence,* section 703 (2d ed.2000).

7. Section 490.065 states that:
   1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
   2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
   3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.
   4. If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.

of the trial court, and this Court will not interfere with that discretion unless it plainly appears that it has been abused." *Id.*

■ Sero and Dr. Anderson qualified as experts in their own fields. Both provided expert testimony and stated that in part their opinions were based in part on documents from Ford. Pursuant to Ford's omnibus motion prohibiting them from interpreting the content of those documents, the trial court sustained Ford's objections to Sero and Dr. Anderson testifying in a manner that interpreted the documents. The documents which they asserted supported their opinions that EMI in certain cruise controls could cause sudden acceleration were apparently all admitted into evidence. Sero and Dr. Anderson read from some of these documents.

In addition, Sero testified in rebuttal concerning the 2000 ODI report. He cited to a number of Ford documents, from which he read extensively into the record, which he asserted showed that his explanation of EMI as a source of sudden acceleration was not merely a theory. He also testified that he has acquired more information from Ford documents that he did not possess when he testified in a prior case involving similar issues. Sero was able to discuss and criticize the methodology of the 2000 ODI report and its sole investigator, Mr. Young. Plaintiffs were permitted to rebut the 2000 ODI report. Plaintiffs' experts testified that Ford documents supported their opinions, read from those documents, and those were admitted into evidence. The trial court did not abuse its discretion and did not err in limiting the interpretation of those documents. Points denied.

■ In their fourth point relied on, plaintiffs aver that the trial court erred by abusing its discretion in allowing Ford to amend its answer to include the affirmative defense that certain plaintiffs did not utilize their seat belts in the accident of May 22, 1994.

■ Rule 55.33 states that leave to amend a pleading "shall be freely given when justice so requires." While the rule stresses liberality in permitting amendments to pleadings, it is not mandatory that the court grant leave. *Sheehan v. Northwestern Mutual Life Insurance Co.,* 44 S.W.3d 389, 394 (Mo.App.2000). There are a number of factors that should be considered in deciding whether to grant leave to amend a pleading, which include: 1) hardship to the moving party if leave to amend is not granted; 2) reasons for failure to include any new matter in previous pleadings; 3) timeliness of the application; 4) whether an amendment could cure any defects of the moving party's pleading; and 5) injustice to the party opposing the motion. *Id.* The decision to allow or to disallow amendments to pleadings is a matter within the sound discretion of the trial court and is reviewed only for an abuse of discretion. *Id.*

■ Ford moved to amend its answer five days after the deposition of Dr. Corrigan on March 12, 2004, and approximately two weeks prior to the trial date. The amendment was based in part on information from Dr. Corrigan's deposition concerning her opinion that some of the plaintiffs were not in fact using seat belts at the time of the accident on May 22, 1994. Under Nebraska law, the failure to wear or utilize seat belts is an affirmative defense that serves only to mitigate damages, and then it does not reduce recovery for damages by more than five percent. *See* Neb. Rev. St. Section 60–6,273; *Vredeveld v. Clark,* 244 Neb. 46, 504 N.W.2d 292, 297–98 (1993).[8] It does not go to causation. *Id.*

---

8. Both parties agree that Nebraska substantive law applies to this issue.

In its original answer Ford asserted that plaintiffs had failed to mitigate their damages "and therefore, any recovery by Plaintiffs should not include any loss which could have been prevented by reasonable care and diligence exercised by them after the alleged losses as referred to in the Petition." Ford did not further specify in what manner plaintiffs failed to mitigate their damages, and it does not appear that plaintiffs filed a motion for a more definite statement regarding this assertion in Ford's answer. The amended answer specified just how Ford contended that some plaintiffs failed to mitigate their damages.

■■■■ Ford would have been placed under some hardship if the trial court had denied its motion to amend. Rule 55.08 requires that a "pleading that sets forth an affirmative defense or avoidance shall contain a short and plain statement of the facts showing that the pleader is entitled to the defense or avoidance." A pleading that makes a conclusory statement and does not plead the specific facts required to support the affirmative defense fails to adequately raise the alleged affirmative defense, and the alleged affirmative defense fails as a matter of law. *See ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 383–84 (Mo. banc 1993); *Stewart Title Guaranty Company v. WKC Restaurants Venture Co.*, 961 S.W.2d 874, 884 (Mo.App. 1998). If Ford had not been permitted to amend its answer, it would have waived this affirmative defense.[9] Ford did not explicitly state a reason why it failed to include this matter in its original petition, but it can be inferred from the language of

the motion that it was Dr. Corrigan's opinion that some of the plaintiffs were not wearing seat belts that led them to seek the amendment, which opinion was revealed in her deposition of March 12, 2004. Regarding timeliness, Ford filed its motion approximately two weeks prior to the scheduled trial date, and five days after Dr. Corrigan's deposition. The amendment could and did cure the defect in Ford's answer regarding the affirmative defense of seat belt non-use, which, pursuant to Rule 55.08, required a statement of the specific facts to support the defense.

The hardship to plaintiffs is limited in that under Nebraska law the affirmative defense of seat belt non-use goes only to mitigation of damages, and can only reduce damages by a maximum of five percent. *See* Neb. Rev. St. Section 60–6,273; *Vredeveld*, 504 N.W.2d at 297–98. The hardship to plaintiffs is further limited by the particular circumstances in that Ford did make a general assertion, even if insufficient to raise an affirmative defense, of failure to mitigate damages, which provided plaintiffs with some notice of the general issue, and Ford did disclose Dr. Corrigan as an expert witness and the expected areas of her expert testimony, which included injury causation issues, biomechanics, and occupant kinematics, in December 2003, which provided further, more specific notice that seat belt non-use could be an issue in the case.

The trial court had to consider a number of factors in deciding on Ford's motion to amend its answer. Under the particular circumstances of this case, the trial court's decision to permit Ford to amend its answer to specifically assert the failure to

---

9. In its motion to amend its answer, Ford states that it did not believe that it was necessary to amend its answer, but was doing so out of an abundance of caution. We disagree. Ford asserts in its brief that even if had not amended its answer, it would still have been able to raise the affirmative defense of failure to use a seat belt because Mrs. Eltiste testified that she did not use her seat belt properly, using only the lap restraint and not the shoulder restraint.

use seat belts as an affirmative defense is not so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of deliberate, careful consideration. Reasonable persons can differ on the propriety of the trial court's action at issue, and accordingly it cannot be said that the trial court abused its discretion. *See Hancock v. Shook,* 100 S.W.3d 786, 795 (Mo. banc 2003). Point denied.

In their fifth point on appeal, plaintiffs contend that the trial court "committed an error of law in permitting Ford to introduce the seat belt evidence on the issue of causation beyond the strictures of the Seat Belt Statute."

Contrary to the argument in plaintiffs' brief based on excerpts from the transcript, the trial court did not "permit" Ford to go beyond the restrictions of the Nebraska seat belt statute. Plaintiffs quote from the trial court where it said "they [Ford] are relying upon the fact that their injuries were created by failure to use a seat belt" and "it's not a seat belt defense." However, the trial court thereafter said in the following exchange in the *in camera* conference on March 30, 2004 that it was limiting the seat belt evidence to mitigation of damages as per the Nebraska seat belt law.

> Mr. Adams [Ford counsel]: On the seatbelt issue, if you're getting to that.
>
> The Court: Well, I am getting to that. The motion to strike evidence of seatbelt is overruled on the basis that the witness was endorsed approximately four months prior to the commencement of this trial. And the defendant had pled an affirmative defense of mitigation of damages, although they now wish to amend their answer to plead, I assume the Nebraska seatbelt law, which the Court is allowing them leave to amend on the grounds that the original answer that was filed by the defendant relative to mitigation of

damages is in accordance with the Nebraska seatbelt law, which does not allow introduction of evidence of the failure to wear a seatbelt as comparative negligence or liability, but rather allows such introduction of such evidence in mitigation of damages.

> Which will present an issue of instructions.
>
> Anything else?
>
> Mr. Adams: No, your Honor. I did find, on the issue of causation—and I don't think that we need to go into that, but there is a case—
>
> The Court: I think I would quit while you're ahead.
>
> Mr. Adams: I will.

The following day, also in chambers, the trial court made the following statement:

> The Court: Well, to be more precise, I felt that—it's my understanding that both parties agree that on the issue of the seat belt—the seat belt statute of Nebraska could be applicable under a conflict of law issue, and that their statute refers to the use of the seat belt defense, or whatever you wish to call it, as not being a defense to, I think they used the term, causation or liability, but as to mitigation of damages.
>
> Mr. Adams: I agree with you.
>
> The Court: They pled originally—I think in their answer they pled mitigation of damages, so I think that they pled that defense or whatever it's called, mitigation, and I have allowed them to amend their answer.

While the trial court permitted Ford to amend its answer and to raise the seat belt defense, its ruling did not "permit" Ford to introduce evidence concerning the non-use of seat belts for any purpose other than that permitted by the Nebraska seat belt law. The trial court, contrary to plaintiffs'

assertion in their brief, did not rule "at the beginning of the trial that Ford would be able to use the seat belt evidence not only for mitigation purposes but also for causation."

Plaintiffs also contend that Ford exploited the trial court's ruling about seat belt evidence in its opening statement by telling the jury that "As a result of the crash, Mr. and Mrs. Eltiste were injured, in part, because they were not wearing seat belts at the time." We note that the transcript indicates that plaintiffs' attorneys first raised the issue of seat belt usage in their opening statement.[10] Regarding Ford's opening statement in which its counsel mentioned the failure of Mr. and Mrs. Eltiste to wear seat belts, we observe that plaintiffs did not object to that statement by Ford's counsel at that time. "A party cannot complain on appeal of any alleged error in which, by his or her own conduct at trial, he or she joined in or acquiesced to." *Johnson v. Moore*, 931 S.W.2d 191, 195 (Mo.App.1996). The failure of a party to object at trial to evidence, testimony, or argument preserves nothing for review on appeal. *Collins v. Hertenstein*, 90 S.W.3d 87, 100 (Mo.App.2002).

Plaintiffs likewise did not object to Dr. Corrigan's testimony on the basis that any of it was directed towards causation rather than mitigation. An objection was made when Dr. Corrigan testified about the types of injuries that she believed Mrs. Eltiste would have sustained if she had worn her seat belt in the following exchange:

Mr. Adams [Ford's counsel]: Let's talk about the type of injuries that you believe she would have sustained if she had been wearing a seat belt as opposed to what she actually sustained.

Mr. Mackey [plaintiffs' counsel]: I object to that on the ground that it calls for speculation, Your Honor.

The Court: The objection will be overruled. She may answer.

Dr. Corrigan: Well, had Mrs. Eltiste been properly restrained, I would not have expected any head injury. I would not expect her to have contacted any structures inside of the vehicle with her head.

I also believe that her pelvic fractures more likely than not would not have occurred because you wouldn't—without the occupant moving forward into the structures in front of her you don't have a mechanism for transmitting that degree of force to the pelvis . . . .

I believe that she likely would have sustained some injuries to her ankles. I think that by wearing a seat belt it may have helped reduce the severity of those fractures, but I think in this accident there still would have been a mechanism *to create some fractures* to the ankles.

Dr. Corrigan also testified about the injuries she thought Mr. Eltiste would have

10. Plaintiffs did not provide this Court with a complete record of the proceedings in the trial court. The record on appeal did not include the opening statement of plaintiffs' counsel. Rule 81.12(a) requires that the record on appeal "shall contain all of the record, proceedings and evidence necessary to the determination of all questions to be presented . . . ." It is the duty of the appellant to prepare a legal file and order a transcript such that the record holds all of the evidence needed for the determination of the questions presented to the appellate court. *Whitnell v. State*, 129 S.W.3d 409, 419 (Mo.App.2004). We also note that Ford could have supplemented the record on appeal under Rule 81.12(c), but rather chose to direct this Court to the testimony of Mrs. Eltiste in her cross-examination in which she acknowledged that she heard one of plaintiffs' counsels state in his opening argument that she was wearing her seat belt.

sustained if he had been wearing a seat belt. Plaintiffs did not object to this testimony. The failure to object preserves nothing for appellate review. *Collins*, 90 S.W.3d at 100. Dr. Corrigan testified as follows:

> Dr. Corrigan: Well, I think that the severity of the facial fractures would have been dramatically reduced. I think that it's still possible that Mr. Eltiste could have contacted the steering wheel even if he had been wearing his seat belt, but I think that the speed and severity of that contact would have been much less than it was.
>
> Basically the seat belt would have slowed him down before he hit the steering wheel. So he still could have sustained bruising and lacerations to his face, perhaps a broken nose, something along those lines, but I would not expect a brain injury nor the severity of fractures he sustained.

In other words, Dr. Corrigan testified that Mr. and Mrs. Eltiste still would have been injured even if they had worn their seat belts properly, which Mrs. Eltiste admitted that she had not done, but that the damages that they suffered would have been lessened, possibly greatly.

The trial court did state that it would have given an oral instruction to the jury prior to Dr. Corrigan's testimony that clearly limited its use by the jury to the mitigation of damages if the jury found Ford liable, if such an instruction had been requested. Dr. Corrigan's testimony was admissible regarding mitigation of damages even if not admissible for causation. If evidence is admissible for one purpose but improper for other purposes, it should be received, subject to a limiting instruction, if requested. *Benoit v. Missouri*

*Highway and Transportation Commission*, 33 S.W.3d 663, 671 (Mo.App.2000) (quoting *Martin v. Durham*, 933 S.W.2d 921, 924 (Mo.App.1996)). "Upon failing to seek an instruction limiting the purposes for which the evidence may be considered, a party cannot later complain that the jury considered such evidence for the wrong purpose." *Id.* Plaintiffs did not request a limiting instruction prior to Dr. Corrigan's testimony.

However, plaintiffs did request an instruction prior to the case going to the jury, Plaintiff's Refused Instruction C, which read as follows: "Evidence that plaintiffs Hal Eltiste and Mrs. Eltiste were not wearing seat belts at the time they were injured shall not be considered when you are deciding the issue of Defendant Ford Motor Company liability or proximate cause of Plaintiffs' injury." The trial court refused to give that proffered instruction and went on to explain that

> [T]his does not mean that the Plaintiffs cannot argue that the seatbelt instruction may not be—cause may not be used—that the defendant cannot argue that this may be considered by the jury as evidence going to proximate cause or as to liability or fault. The plaintiff can argue that it does not go to proximate cause or fault. But the issue of the seatbelt defense is not being withdrawn from the jury in mitigation of damages, and the instruction speaks for itself what that instruction may be used for. And it's not withdrawing an issue.

The trial court did not consider a specific limiting instruction necessary given the instructions that he gave to the jury on mitigation of damages regarding Mr. and Mrs. Eltistes' claims, which were Instruction No. 9 and Instruction No. 12 respectively.[11] We note that plaintiffs do not

---

11. Instruction No. 9 stated:

If you find in favor of plaintiff Hal Eltiste, you must find that plaintiff failed to miti-

assert in their point relied on that the trial court erred by failing to give the requested limiting instruction, but rather mention in their argument that the trial court refused to give such a written instruction. This Court need not consider errors raised for the first time in the argument portion of the brief that are not raised in the point relied on. Rule 84.04(e); *City of Sullivan,* 142 S.W.3d at 193. Nevertheless we will discuss this issue *ex gratia.*

■ "When a trial court receives evidence admissible for one purpose but not for another, a party upon request is entitled to an instruction limiting the extent and purpose for which the jury may consider the evidence." *Clayton Center Associates v. W.R. Grace & Company,* 861 S.W.2d 686, 691 (Mo.App.1993). In *Clayton Center,* as in the case before this Court, evidence was admitted that was admissible regarding damages, but not on the issue of liability. *Id.* The trial court did not give the limiting instruction requested regarding the use of the evidence. *Id.* This Court held that the trial court erred because it should have given an appropriate limiting instruction when so requested. *Id.* However, this Court did not reverse even though the trial court improperly refused to give the instruction. *Id.* While failure to give an instruction to which a party is entitled to is error, reversal is warranted only if the error is prejudicial, that is when the merits of the action are materially affected. *Id.*

■ The trial court in the present case should have given an appropriate limiting instruction regarding the seat belt evidence, such as that requested by plaintiffs. Instructions No. 9 and No. 12 are not limiting instructions, though the language in those instructions is clear. However, the trial court's refusal to give the instruction, while error, is not reversible error unless it materially affected the merits of the action. In *Clayton Center,* as in the case before this Court, the party which requested the limiting instruction that was refused pointed out to the appellate court instances in which the opposing party allegedly used the evidence at issue as evidence regarding liability rather than damages. *Id.* As in *Clayton Center,* our review of the record in this case does not leave us with the impression that the merits of the action were materially affected by the trial court's failure to give the requested limiting instruction. The jury found that Ford was not liable at all. It did not make a finding that Ford was liable and that liability was partially offset by the comparative fault of Mr. and Mrs. Eltistes' failure to wear their seat belts. Dr. Corrigan's testimony, viewed in the light most favorable to Ford, did not suggest that Ford was not liable. Rather she said that both Mr. Eltiste and Mrs. Eltiste still would have been injured in the accident, but the severity of their injuries would have been less had they been wearing their seat belts. In Ford's closing argument, counsel made an explicit reference to the lack of seat belt use by Mr. and Mrs. Eltiste, as follows:

> Mr. Adams [Ford's counsel]: One instruction that you have also been given and which, this is the only element

gate damages if you believe:
> First, plaintiff Hal Eltiste was not wearing his seat belt at the time of the accident, and
> Second, plaintiff Hal Eltiste thereby sustained damage which would not have occurred otherwise.

Instruction No. 12 stated:

> If you find in favor of plaintiff Fran Eltiste, you must find that plaintiff failed to mitigate damages if you believe:
> First, plaintiff Fran Eltiste was not wearing her seat belt at the time of the accident, and
> Second, plaintiff Fran Eltiste thereby sustained damage which would not have occurred otherwise.

of this case that Ford has to bear the burden of proof on, is on the issue of mitigation of damages.

If you find in favor of Hal F. Eltiste, you must find that plaintiff failed to mitigate damages if you believe, first, Hal Eltiste was not wearing a seatbelt at the time of the accident, and second, plaintiff thereby sustained damage which would not have otherwise occurred.

And ladies and gentlemen, with respect to any damages, there's nothing about punitive damages in this case. There's nothing about justice and respect. This boils down to—and you'll see the damage instruction, and Ford believes that you never should reach it. But it just comes down to what you believe he sustained as a result of this occurrence. . . .

Then, as far as the damages, you'll have to decide what that amount is. And then on the failure to mitigate, you will note that if you make a finding under that one instruction that I just showed you that you don't believe that they had their seatbelts on, and that they were thereby injured more than they otherwise would have been, then you can reduce the damages up to five percent.

Mr. Mackey [plaintiffs' counsel] I object, Your Honor, that's a misstatement of the law. It is up to the Court to make that reduction.

Mr. Adams: They can put down a number from zero to five percent, which is what it says right underneath that.

Ford's counsel was not arguing causation, but rather specifically mitigation, only if the jury found in plaintiffs' favor.

▆▆▆▆ In the argument portion of its brief on its fifth point relied, plaintiffs also assert that the trial court should have permitted them to call an expert witness to rebut Dr. Corrigan's testimony. At the *in camera* conference on March 31, 2004, plaintiffs' counsel requested "permission of the Court to name—to see if we can find an expert so as to provide some rebuttal testimony of [Dr. Corrigan]." Ford's counsel opposed this based on the fact that Dr. Corrigan had been disclosed as an expert witness in December 2003, and it was too late on March 31st to try to name a rebuttal expert. The court denied the request. Trial courts have broad discretion to exclude expert witnesses who are not timely disclosed. *Goede v. Aerojet General Corporation,* 143 S.W.3d 14, 23 (Mo.App.2004). An abuse of discretion occurs when the trial court's ruling is so unreasonable and arbitrary that it shocks the sense of justice and is clearly against the logic of the surrounding circumstances. *McReynolds v. Mindrup,* 108 S.W.3d 662, 665 (Mo.App.2002) (quoting *In re Estate of Dean,* 967 S.W.2d 219, 224 (Mo.App.1998)). Under this standard of review, a trial court seldom commits reversible error by mere exclusion of expert testimony, even if the offered testimony is relevant and admissible. *Id.* (quoting *Bella v. Turner,* 30 S.W.3d 892, 896 (Mo.App.2000)). The trial court did not abuse its discretion by denying plaintiffs' request to call an expert to rebut Dr. Corrigan's anticipated testimony.

Thereafter, in the *in camera* conference immediately prior to Sero's rebuttal testimony, plaintiffs' counsel indicated that he had found an accident reconstruction expert, Dr. Sokol, who was present in St. Louis and could testify to rebut Dr. Corrigan, and indicated to the court what Dr. Sokol would say if called, as if he intended to make an offer of proof. However, plaintiffs' counsel then indicated that he did not intend to call Dr. Sokol as a rebuttal witness as trial strategy, and likewise indicated that he did not intend to call Mr. and Mrs. Eltiste to testify in rebuttal as a

matter of trial strategy.[12] It is difficult to fault the trial court for what plaintiffs' counsel clearly indicated was a matter of trial strategy.

Assuming *arguendo*, that elements of Dr. Corrigan's testimony were directed towards the issue of causation/liability rather than the mitigation of damages, which is admissible, we observe that it was apparently plaintiffs' counsel who first mentioned in his opening statement that Mrs. Eltiste was wearing her seatbelt at the time of the accident. No testimony or other evidence came in during Ford's cross-examinations of Mrs. Eltiste to show that she was not wearing her seatbelt.[13] On re-direct examination Mrs. Eltiste testified in the following exchange that she was wearing a seatbelt, but also that she was wearing it improperly by not using the shoulder belt.

> Mr. Kruger [plaintiffs' counsel]: Mr. Adams was also asking you a series of questions about whether you had your seatbelt on. You were a nursing mother at that time?
>
> Mrs. Eltiste: Yes . . .
>
> Mr. Kruger: How do you know you had your seatbelt on?
>
> Mrs. Eltiste: I put my seatbelt on when we got into the van.
>
> Mr. Kruger: Okay. And you were wearing—how about the shoulder belt. Were you wearing that?
>
> Mrs. Eltiste: No.
>
> Mr. Kruger: You just had the lap belt on?
>
> Mrs. Eltiste: Yes.
>
> Mr. Kruger: Why was that?
>
> Mrs. Eltiste: Well, if you're a nursing mom, the pressure of belts and stuff can really irritate you on this section. And I had a habit of taking my arm through and taking the shoulder [belt] behind me. But I had my waist belt on. But I had taken it down so it wouldn't push down where its tender.

On direct examination, Mr. Eltiste confirmed that Mrs. Eltiste was not using the shoulder belt, and stated that he used his seatbelt. Rebecca Bremer stated that she

---

**12.** Mr. Kruger [plaintiffs' counsel]: However, I've met with all of our team of counsel, even though Dr. Sokol is here in town, and we've decided that for trial strategy purposes, we will respect this Court's decision, which was earlier, and was going to deny us access to any kind of expert witness on the seatbelt thing. And we're going to let it stand at that. So we're not going to call Dr. Corrigan or Dr. Sokol this morning. . . . Number two, for trial strategy purposes, we've also made a decision not to call either Hal or Fran [Eltiste] with respect to rebuttal, even though in my opinion, this case has been severely compromised by the tactics of defense counsel. And I want the record to reflect that immediately after the close of evidence last Friday, there was an informal conference with the defense coming into this court and, despite making all the protestations about the defense of mitigation of damages and use of the seatbelt, contemplated now withdrawing that instruction. Because the sole purpose, in my opinion, of defendant's putting on this seat-belt defense was to prejudice the plaintiff's case in chief, which deals with the issues of liability. But we now understand that the Court is going to give just the mitigation of damage instruction, which specifically says that the jury is not to give any consideration of that when it comes to liability.

And based upon that, we are not going to call—recall Fran or Hal for rebuttal evidence[.]

**13.** On cross-examination Mrs. Eltiste stated that she was wearing her seatbelt at the time of the accident. Ford sought to introduce a record from the office of the paramedics who responded to the accident of May 22, 1994 that indicated that Mrs. Eltiste was unrestrained at the time of the accident. The objection of plaintiffs' counsel to the admission of that record was sustained because the conclusion that Mrs. Eltiste was unrestrained at the time of the accident was based on hearsay, as none of paramedics could have observed her at the time of the accident.

fastened her seatbelt only right before the accident.

Ford contends that the plaintiffs effectively "opened the door" to other evidence about seatbelt use or non-use regarding causation analysis, and thus are precluded from now appealing over Ford's introduction of evidence that responded to such evidence from the plaintiffs. The general rule is that a party cannot complain on appeal of any alleged error in which, by his or her own conduct, he or she acquiesced to or joined in. *Johnson*, 931 S.W.2d at 195. In *Schisler v. Rotex Punch Company, Inc.*, 746 S.W.2d 592, 594 (Mo.App. 1988), the plaintiff allowed in testimony on acts of contributory negligence without objection and confronted those issues by his own evidence and in his closing argument. This Court held that "[a] party may not complain of alleged error which his own conduct creates." *Id.* In similar fashion, plaintiffs in the case before this Court made few objections to Dr. Corrigan's testimony following the trial court's pre-trial ruling that Ford could amend its answer to specifically assert the so-called seatbelt defense regarding mitigation of damages, and none pertaining to Dr. Corrigan's testimony being used for causation rather than mitigation of damages. Further, the testimony of Mr. and Mrs. Eltiste about the latter's improper use of the seatbelt restraints did open the door for Dr. Corrigan's testimony on the use or non-use of seatbelts. There was no prejudicial error regarding the seatbelt defense. Point denied.

The judgment of the trial court is affirmed.

GLENN A. NORTON and NANNETTE A. BAKER, JJ., concur.